AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

JUN 2 3 2017

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 1:17-sw-379 |
| a black and white HTC cellular phone, bearing serial number HT14SHL14071 | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
a black and white HTC cellular phone, bearing serial number HT14SHL14071, further described in Attachment A,

located in the ____Eastern____ District of ____Virginia____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | Conspiracy to distribute cocaine. |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Kenneth M. Smith, Special Agent, FBI

*Printed name and title*

Theresa Carroll Buchanan
United States Magistrate Judge

Sworn to before me and signed in my presence.

*Judge's signature*

Date: ____06/23/2017____

City and state: Alexandria, Virginia

Hon. Theresa C. Buchanan, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

The property to be searched is the following device ("Device 5"), currently in the custody of the Federal Bureau of Investigation, and located at 9325 Discovery Boulevard, Manassas, Virginia, within the Eastern District of Virginia:

- a black and white HTC cellular phone, bearing serial number  HT14SHL14071

# ATTACHMENT B

1.      All information and records on the Device described in Attachment A that may be evidence of violations of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine), including, but not limited to:

>    communications or information relating to the planned receipt, transportation, or distribution of cocaine;
>
>    photographs or videos of criminal associates;
>
>    address/phone books or contact information that reflect names of potential criminal associates;
>
>    call logs;
>
>    records, photographs, videos, or communications relating to the purchase of duffle bags or other items for use in connection with the receipt and transportation of cocaine;
>
>    records of storage facilities owned or rented;
>
>    cellular and landline telephone statements and records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of Internet Protocol addresses, including:

>    a.      records of Internet Protocol addresses used;
>
>    b.      records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.      All GPS information on the subject phone.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  Such records and information include the content of communications, text messages, voice mail messages, photographs, images, and video.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JUN 2 3 2017

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| (1) A BLACK HUAWEI CELLULAR PHONE | ) | No. 1:17-sw-375 |
| BEARING SERIAL NUMBER | ) | |
| 2XA9MB1111111586; | ) | |
| (2) A BLACK AND BLUE SAMSUNG | ) | No. 1:17-sw-376 |
| CELLULAR PHONE | ) | |
| BEARING HEX # A000001D4D09F6; | ) | |
| (3) A BLACK HTC CELLULAR PHONE | ) | No. 1:17-sw-377 |
| BEARING SERIAL NUMBER FA356S903503; | ) | |
| (4) A GRAY SAMSUNG CELLULAR FLIP | ) | No. 1:17-sw-378 |
| PHONE BEARING MEID HEX # | ) | |
| A00000403C6EC1; | ) | |
| (5) A BLACK AND WHITE HTC CELLULAR | ) | No. 1:17-sw-379 |
| PHONE BEARING SERIAL NUMBER | ) | |
| HT14SHL14071; and | ) | |
| (6) A GRAY SAMSUNG CELLULAR FLIP | ) | No. 1:17-sw-380 |
| PHONE BEARING MEID HEX | ) | |
| # A0000039EBE38B | ) | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Kenneth M. Smith, being duly sworn, state the following:

1.       I have served as a Special Agent of the Federal Bureau of Investigation (FBI) since

2008.  From February 2009 to September 2016, I was assigned to a squad which investigates

Criminal Enterprises and Violent Gangs out of the Washington Field Office (WFO), Northern

Virginia Resident Agency (NVRA).  I am currently assigned to an intelligence squad at the NVRA.

As a Special Agent with the FBI, I have conducted physical surveillance, analyzed phone records,

and participated in the application and execution of search warrants and arrest warrants for

numerous defendants, including drug traffickers and violent gang members.  I have also spoken to

confidential sources, suspects, defendants, witnesses, and other experienced investigators

concerning the methods and practices of drug traffickers. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by drug traffickers, as well as the inner-workings of major drug trafficking organizations. Prior to joining the FBI, I was a corrections officer in Utah for over six years.

2.     This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of six electronic devices (hereinafter collectively, "the Devices"): a black Huawei cellular phone, bearing serial number 2XA9MB1111111586 ("**Device 1**"); a black and blue Samsung cellular phone, bearing HEX # A000001D4D09F6 ("**Device 2**"); a black HTC cellular phone, bearing serial number FA356S903503 ("**Device 3**"); a gray Samsung cellular flip phone, bearing MEID HEX # A00000403C6EC1 ("**Device 4**"); a black and white HTC cellular phone, bearing serial number HT14SHL14071 ("**Device 5**"); and a gray Samsung cellular flip phone, bearing MEID HEX # A0000039EBE38B ("**Device 6**"). Each device is fully described in Attachment A. All of the Devices are currently in the custody of the FBI and located at 9325 Discovery Boulevard, Manassas, Virginia, within the Eastern District of Virginia.

3.     Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I seek authority to search the Devices for evidence, fruits, and instruments related to the unlawful activities described in this affidavit, namely violations of Title 21, United States Code, Sections 841 and 846 (conspiracy to distribute cocaine, a Schedule II controlled substance). The applied-for warrants would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data. The specific items and data to be searched for and seized are listed in Attachment B.

4.      The facts and information contained in this affidavit are based upon my training and experience, participation in investigations, personal knowledge and observations during the course of this investigation, as well as the observations of other agents and police officers involved in this investigation.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of records, documents and other physical evidence obtained during the course of this investigation.

5.      This affidavit contains information necessary to support probable cause.  It is not intended to include each and every fact and matter observed by me or known to the United States.

### Identification of the Devices to Be Examined

6.      The property to be searched is described in Attachment A.  All six Devices are currently located at 9325 Discovery Blvd, Manassas, VA.  The applied-for warrants would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### Factual Basis Supporting Probable Cause

7.      In May 2012, the FBI partnered with the Prince William County Police Department (PWCPD) in the latter's ongoing investigation of TONY Bowles, who was reported by multiple sources to be a substantial cocaine and crack dealer. The FBI and PWCPD learned that the ATF, the Sheriff's Office for Fairfax County, and the Manassas Park Police Department were also investigating TONY and his associates, which led to all the involved agencies combining their efforts to uncover the full scope of TONY's criminal activity.

8.      The investigation revealed that TONY had a large network of people with and through whom he distributed cocaine and crack, to include NARATIO Bowles, Aaron DANGERFIELD, Keith HENDERSON, Kimanita JOHNSON, Christopher JONES, Ellsworth

3

JUGGINS, James MCQUEEN, Jonathan SANDERS, Melanie McALPINE, DARREL Williams, and Donald YOUNGBLOOD. TONY and his associates operated primarily in and around Woodbridge, Triangle, Dumfries, Stafford, and Fredericksburg, Virginia, all within the Eastern District of Virginia.

9.      The investigation further revealed that one of TONY's primary sources of supply was Johnnie HILL, from whom TONY frequently obtained several-hundred-gram quantities of cocaine. HILL lived within the Eastern District of Virginia and supplied numerous other people with cocaine and crack, to include Steven BATES, Marvin DIXON, Donna PORTER, Paul STARNER, and Thomas THURMAN. In order to meet his supply needs, HILL obtained multi-kilogram quantities of cocaine.

10.      MARCIANO Reza lived in North Carolina and, along with Brennan CHRISTIAN, Lazaro JAIMES, FRANCISCO Reza, and VENANCIO Reza, obtained multi-kilogram quantities of cocaine that they then distributed, as both cocaine and crack. During the course of investigating HILL, agents determined that he and MARCIANO maintained phone contact because MARCIANO was a backup or alternate source of supply for HILL. Agents also learned that MARCIANO and VENANCIO were targets of a joint investigation by the North Carolina State Bureau of Investigation, the Sheriff's Departments for Moore and Montgomery Counties in North Carolina, and the Department of Homeland Security, Homeland Security Investigations.

11.      UCC-1[1] is one of the people who supplied MARCIANO with kilogram quantities of cocaine. Agents discovered that one of the methods UCC-1 used to transport cocaine to

---

[1] There are several uncharged co-conspirators referred to throughout this affidavit by "UCC" and a corresponding number. The numbers assigned these uncharged co-conspirators do not carry any significance, do not represent their respective roles within the conspiracy, and do not necessarily appear sequentially in this affidavit. There are uncharged co-conspirators referenced within this affidavit who are not labeled a UCC. Each UCC is referred to in the masculine gender, regardless of their true gender.

4

MARCIANO was through a New Jersey-based long-haul trucking business run by HENRY GUARDIA. GUARDIA had several truck drivers, to include Morris WELCOME, and they used legitimate loads of cargo as a cover to smuggle substantial quantities of cocaine and other controlled substances across the country. As described in more detail below, in April 2013, WELCOME drove one of GUARDIA's trucks down the East Coast, through the Eastern District of Virginia and into North Carolina, where he met with MARCIANO and supplied him with fourteen kilograms of cocaine. The cocaine came from UCC-1.

12.     Law enforcement has used many methods to investigate the conspiracies. These include interviews of confidential sources and defendants, consensually monitored phone calls, search warrants, analysis of toll records and other telephone records, examination of wire transfers and other financial records, review of pole camera footage, and physical surveillance. Wherever in this affidavit I discuss information resulting from physical surveillance conducted in this investigation, that information, except where otherwise indicated, does not set forth my own personal observations, but rather that which has been provided directly or indirectly to me through other law enforcement officers who made such observations.

13.     Controlled purchases of cocaine and crack were also made from several defendants by confidential sources and undercover officers. Prior to each controlled purchase involving a confidential source, the confidential source and any vehicle they planned to use was searched prior to and following the transaction to ensure that no contraband was present, with negative results each time. After each transaction, all contraband and evidence purchased, as well as any remaining monies, were relinquished by the confidential source to law enforcement. To date, agents have collected through controlled purchases and seizures in excess of 14 kilograms of cocaine and 280 grams of crack.

5

14.     Additionally, United States District Judges Leonie M. Brinkema, Anthony J. Trenga, Liam O'Grady, and Gerald Bruce Lee, of the United States District Court for the Eastern District of Virginia, issued between them ten Orders authorizing law enforcement to intercept communications over eleven cellular telephones used by certain defendants. Thousands of intercepted communications have been pertinent to this investigation. Interception of wire communications and, in some instances, electronic communications, over the following telephones occurred over the following time periods:

      a.     (804) 263-5904 ("Target Telephone #1"), used by TONY, from December 17, 2012, to February 13, 2013. Authorization was given to intercept wire and electronic communications.

      b.     (804) 316-6479 ("Target Telephone #2"), used by TONY, from January 16, 2013, to April 13, 2013. Authorization was given during the initial thirty-day period of interception to intercept wire communications. During the second and third thirty-day periods of interception, authorization was given to intercept wire and electronic communications.

      c.     (215) 983-4866 ("Target Telephone #3"), used by HILL, from February 14, 2013, to May 11, 2013, and then from May 17, 2013, to July 13, 2013. Authorization was given to intercept wire and electronic communications.

      d.     A telephone number ending in the last four digits 9731 ("Target Telephone #4"), used by UCC-2, from February 14, 2013, to March 15, 2013. Authorization was given to intercept wire communications.

      e.     (910) 975-5311 ("Target Telephone #5"), used by MARCIANO, from April 12, 2013, to May 12, 2013, and then from August 12, 2013, to September 10, 2013. During the initial thirty-day period of interception, authorization was given to intercept wire communications,

6

while during the second period of interception, authorization was given to intercept wire and electronic communications.

      f.      (910) 975-7648 ("Target Telephone #6"), used by MARCIANO, from May 17, 2013, to July 25, 2013. Authorization was given to intercept wire and electronic communications.

      g.      A telephone number ending in the last four digits 8062 ("Target Telephone #7"), used by WELCOME, from May 20, 2013, to May 31, 2013. Authorization was given to intercept wire communications.

      h.      A telephone number ending in the last four digits 0418 ("Target Telephone #8"), used by GUARDIA, from June 14, 2013, to August 10, 2013, and then from August 12, 2013, to September 10, 2013. Authorization was given to intercept wire communications.

      i.      (646) 527-2099 ("Target Telephone #9"), used by DIXON, from June 14, 2013, to July 13, 2013. Authorization was given to intercept wire communications.

      j.      (786) 459-1960 ("Target Telephone #10"), used by CHRISTIAN, from July 26, 2013, to August 24, 2013. Authorization was given to intercept wire and electronic communications.

      k.      A telephone number ending in the last four digits 4156 ("Target Telephone #11"), used by UCC-1, from July 26, 2013, to August 19, 2013. Authorization was given to intercept wire communications.

     15.     During the course of intercepting communications over these telephones, many of the defendants who used their respective telephone(s) identified themselves by their first and/or last name, and/or were identified as such by a person with whom they were communicating. Furthermore, during their respective periods of interception, Target Telephones #1 and #2 were

registered in TONY's name, Target Telephone #7 was registered in WELCOME's name, and Target Telephone #8 was registered in GUARDIA's name. Finally, physical surveillance and other investigative techniques, in conjunction with the intercepted communications, confirmed the identities of the defendants using their respective telephone(s).

16.    Unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, such statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, any statements excerpted from recorded conversations, including those that are quoted, are subject to further revision for clarification and/or accuracy. Many intercepted communications over Target Telephones #5, #6, #8, and #11 occurred in Spanish and were translated into English by the wiretap monitor.

17.    Not all relevant intercepted communications are described and not all relevant portions of mentioned communications have been described. The summaries of and quotations from intercepted communications that are discussed in this affidavit are based on line sheets and reviews of recordings, and not final or certified transcripts. All dates and times for those intercepted communications discussed in this affidavit are approximate and based on the monitoring equipment at the time the respective communications were intercepted. Any other times referenced in this affidavit, relating to surveillance, for instance, are approximations.

18.    Discussions of particular intercepted communications include a reference to the Target Telephone on which the communications was intercepted, indicated by "TT" followed by the number of the telephone, as well as the unique session number assigned to the communication by the monitoring equipment. For instance, the first intercepted communication over Target Telephone #1 would be referenced as "TT1 #1." With quotations of communications, brackets are used for the following purposes: The use of "[UI]" indicates that the word or words used were

8

unintelligible and thus could not be translated, and the use of "[OV]" indicates that the parties to a call were talking over one another and thus some words could not be heard. A phonetic spelling of a word that is not known, does not have a common spelling, and/or could not be translated is indicated with "[PH]." Brackets are also used to protect the identifying information of persons not named as defendants, as well as to provide certain contextual information, *e.g.*, to explain which defendant is being referenced when a nickname is used by another co-conspirator to refer to that defendant.

## MARCIANO

### A. Background

19.    MARCIANO was a kilogram-level cocaine distributor operating primarily in North Carolina. He worked closely with several associates to distribute the cocaine, and his main partners included his brother VENANCIO, his nephew FRANCISCO, and his brother-in-law JAIMES. MARCIANO obtained large quantities of cocaine from numerous sources of supply, to include CHRISTIAN and UCC-1. During the investigation, UCC-1 employed GUARDIA, who owns a long-haul trucking company, and WELCOME, who drives a truck for GUARDIA's company, to deliver what I believe to be fourteen kilograms of cocaine to MARCIANO.

20.    Two of MARCIANO's phones were wiretapped during the investigation. He was identified as the user of those phones through various means, to include: the identities of the people with and about whom MARCIANO spoke, many of whom are known by investigators to be his family members; a call on May 24, 2013, in which he told UCC-1 that his father's name is "Marciano Reza" (TT6 #505); and a call on July 2, 2013, in which JAIMES told MARCIANO that he sent a wire transfer on behalf of MARCIANO, and when MARCIANO asked specifically, "Under whose name? My name?" JAIMES responded, "Yeah, under Marciano, Jr." (TT6 #4,318).

Additionally, agents were able to identify through intercepted calls and other investigative techniques the identity of who agents believe to be MARCIANO's wife and mother of his recently born child. They then were able to find her Facebook account, which is referenced in intercepted calls, which has a picture of MARCIANO with his wife.

21.     What follows are two parts. The first deals with MARCIANO's distribution network; and the second with a specific deal for fourteen kilograms that took place on April 13, 2013, and involved GUARDIA and WELCOME.

**MARCIANO'S DISTRIBUTION NETWORK**

22.     MARCIANO worked very closely with VENANCIO, FRANCISCO, JAIMES, and CHRISTIAN to purchase and redistribute cocaine. They each had their own customers, but they all worked together and helped one another out, to include loaning money and drugs within the group. MARCIANO and CHRISTIAN had their own sources of supply for cocaine, and they often supplied each other if the other person did not have any themselves or if they came across what they believed to be a good deal. MARCIANO was responsible for obtaining cocaine not only for himself, but also for VENANCIO, FRANCISCO, and JAIMES. Once the cocaine was sold, VENANCIO, FRANCISCO, and JAIMES collected the money from their customers, and gave that to MARCIANO to pay his sources of supply.

23.     What follows is the description of two incidents, one on June 7, 2013, and the other on June 29, 2013, that capture clearly the relationship between MARCIANO, CHRISTIAN, JAIMES, FRANCISCO, VENANCIO, and UCC-1.

24.     The incident on June 7, 2013, centered on MARCIANO obtaining nine kilograms of cocaine from UCC-1 that he divided between himself, VENANCIO, FRANCISCO, JAIMES, and CHRISTIAN.

a.      On June 6, 2013, at 3:45 p.m., UCC-1 called MARCIANO and brokered a deal with him for ten kilograms of cocaine at a price between $35,000 and $36,000 per kilogram. (TT6 #1,554).

b.      CHRISTIAN called MARCIANO at 6:20 p.m. from a new telephone number and told MARCIANO, "What's up brother, this is my new number and shit." MARCIANO then told him about the deal he brokered with UCC-1. "He was gonna let me get it for thirty-six. . . . But he still gonna front 'em to me. I'm just waiting on him to call me. . . . Yeah, so I might just put like five on you, something like that. He give me, he give me, he give me a week on it." CHRISTIAN replied, "Okay, alright. I gotcha." (TT6 #1,591). I believe MARCIANO was explaining that he would get the kilograms at $36,000 a piece, but that all or a portion of the cocaine would be fronted and he would have a week to pay off the entire cost of the deal. I further believe that he was going to give CHRISTIAN five of the kilograms.

c.      At 6:51 p.m., MARCIANO spoke again with UCC-1 and asked if the deal would take place that day or the next. UCC-1 said he was told the person with the cocaine would be ready that day to do the deal. (TT6 #1,604).

d.      MARCIANO called VENANCIO at 6:52 p.m. and asked, "How much change you got on you, bro?" VENANCIO said, "Probably like fifty, sixty, somewhere." MARCIANO explained, "[T]hey want me to put a down payment on a car. . . . Yeah cause they trying to throw me, um, ten. . . ." Later in the call, VENANCIO asked, "What they need? What they want?" MARCIANO explained, "They want at least one hundred." VENANCIO was taken aback, saying, "Damn, boy." MARCIANO replied, "Yeah, but they giving us ten, though." (TT6 #1,606). I believe that MARCIANO was saying he had to pay $100,000 up front for the ten

11

kilograms of cocaine, and that he was arranging to get a portion of that money from VENANCIO, who said he had between $50,000 and $60,000.

      e.     At 8:06 p.m. MARCIANO called UCC-1 and told him that the deal would have to wait till the next day. (TT6 #1,628).

      f.     At 9:10 p.m., MARCIANO told CHRISTIAN, "I was suppose to see them in the a.m., early in the morning." He added, "Hell, yeah. So soon as I get them in my hands, I'll call ya." (TT6 #1,631).

      g.     At 9:16 p.m., MARCIANO told UCC-1 that he had only been able to gather up "eighty-nine bucks," which I believe meant $89,000. UCC-1 said the person with the cocaine was expecting "one hundred bucks," which I believe meant $100,000. MARCIANO said he would see what he could do to get the remaining balance. (TT6 #1,633).

      h.     At 11:17 p.m., JAIMES texted MARCIANO, "They come through?" (TT6 #1,636). MARCIANO responded, "In the morning." (TT6 #1,637).

      i.     On June 7, 2013, at 7:29 a.m., MARCIANO texted VENANCIO, "Right here about to get right." (TT6 #1,677). VENANCIO wrote back, "Ok lil bro safe let me kno wen u on yo way back." (TT6 #1,678). I believe MARCIANO was saying that he was at or near the deal location and about to pick up the cocaine.

      j.     At 9:15 a.m., MARCIANO told VENANCIO he was on his way back. He explained, "He gave me nine. I thought he was gonna have ten. He ain't have nothing but nine." VENANCIO asked, "Well we got it for thirty-six though, right?" MARCIANO replied, "Nah, thirty-six-and-a-half." Later MARCIANO described the appearance of the cocaine, saying, "But it look like flake [slang for high quality cocaine]. You can, it just look like, um, it just look like the, they look fat. They kinda fat looking." (TT6 #1,700).

k.      MARCIANO called UCC-1 at 9:27 a.m. and told him, "I already got that."
He further explained, "Everything is fine. Some look a bit beaten up. I'll check them out and see
how it looks." (TT6 #1,704).

l.      At 11:51 a.m., MARCIANO and VENANCIO discussed that they and
FRANCISCO would meet later that day so MARCIANO could supply them with cocaine. (TT6
#1,715).

m.      In a text message at 12:01 p.m., VENANCIO wrote MARCIANO, "Send
two," by which I believe he meant two kilograms. (TT6 #1,717). At 12:03 p.m., MARCIANO told
VENANCIO in a call that he was "going to send you a pretty one in there, and two halves." (TT6
#1,720). I believe he was saying that it would be one whole kilogram and two half kilograms, for
a total of two kilograms.

n.      At 12:26 p.m., MARCIANO told JAIMES, "Shit, I got my hands on that,
man," and "They charging thirty-six-and-a-half." JAIMES said, "Okay then, that's cool. I'm gonna
call old boy and see what he wants." MARCIANO asked, "Yeah, he always bought one, right?"
JAIMES said, "Yeah, hell yeah." MARCIANO surmised, "If the number right, he'll probably buy
two." MARCIANO added, "Okay, just let me know, bro. I'll put some up for you, though." (TT6
#1,728).

o.      At 12:42 p.m., MARCIANO and FRANCISCO discussed the location
where they were going to meet in a few moments to pass off the cocaine. (TT6 #1,732).

p.      At 12:51 p.m., MARCIANO and VENANCIO spoke and it appeared that
the transfer had already taken place because MARCIANO told him, "I meant to tell you, uh, that
nigger, he only gave us a week on it, too." I believe he was saying that they had to pay the full
price of the nine kilograms within one week. MARCIANO went on to explain that the person he

13

picked up the cocaine from said that they could supply MARCIANO "every two weeks." VENANCIO replied, "Yeah, every two weeks. Yeah [UI] we'll be alright." (TT6 #1,740).

q.      FRANCISCO called MARCIANO at 2:45 p.m. and asked, "Can you get me something bro? Some good, something good?" MARCIANO asked, "Yeah, what?" FRANCISCO replied, "I need a whole one," but said, "Don't bring the little, the half, the what's it half or whatever because they're not, they ugly bro." I believe FRANCISCO was describing the two half kilograms MARCIANO had provided him and VENANCIO earlier that day, as FRANCISCO went on to say, "Yeah, yeah, the, the little, the other one is beautiful, but . . . the other little pieces, they ugly." MARCIANO responded, "They said it was flame, supposedly. That's what they said." FRANCISCO told him, "I don't know what that mean; they don't look like it." (TT6 #1,761).

r.      FRANCISCO called back two minutes later and said, "Bro, never mind, never mind. They both, they all ugly, bro. . . . We just like broke it and its ugly. . . . They ain't even scale." (TT6 #1,763).

s.      At 3:23 p.m., MARCIANO called CHRISTIAN and told him, "They came through, man." He continued, "I was gonna give you two of them in the morning, too." CHRISTIAN responded, "Oh, okay." In reference to the person from whom MARCIANO got the cocaine, MARCIANO explained, "He said as soon as I finish this, I'll go get some more." (TT6 #1,770).

t.      At 3:54 p.m., MARCIANO called VENANCIO, who asked, "You still got the other one for me, don't you?" MARCIANO replied, "That, that how many you wanted?" VENANCIO said, "Three." MARCIANO responded, "Okay, yeah. Cause, um, you're getting three; Lazo [shortened first name of JAIMES] want two; I'm giving Twin [CHRISTIAN's

nickname] two, Pancho [FRANCISCO's nickname] getting one, and I'm getting one." (TT6 #1,780). This accounted for the nine kilograms MARCIANO had obtained earlier that day.

25. On June 29, 2013, MARCIANO obtained three kilograms of cocaine from CHRISTIAN that were intended to be divided between him, VENANCIO, FRANCISCO, and JAIMES.

a. On June 28, 2013, at 5:36 p.m., CHRISTIAN texted MARCIANO: "He ready." (TT6 #3,651). I believe CHRISTIAN was telling MARCIANO that his (CHRISTIAN's) source of supply had cocaine.

b. MARCIANO immediately called VENANCIO, telling him, "Nah, um, Twin just hit me back. Say old boy got something." VENANCIO asked, "What you going to do?" MARCIANO said, "Shit, I might just grab me a goddamn half-time or one. That's it. I ain't going all in, fuck that." MARCIANO asked VENANCIO, "You going to grab you one, too?" VENANCIO replied, "Yeah." MARCIANO said, "I'mma see when they going to see him. It'll probably be today or tomorrow. Ain't no telling." VENANCIO said, "Yeah, find out let me know." (TT6 #3,652). I believe that MARCIANO and VENANCIO were going to get cocaine from CHRISTIAN's source, specifically a half kilogram to one kilogram for MARCIANO and one kilogram for VENANCIO.

c. MARCIANO then called CHRISTIAN right back at 5:38 p.m. and said, "I know I'm gonna do one. Then my bro might do one. Probably like, probably do like two-and-a-half or three. Some shit like that." (TT6 #3,653).

d. MARCIANO's next call was to FRANCISCO at 5:39 p.m., who asked "They got some?" MARCIANO told him, "They said he can. . . . I told him I'm just gonna grab one, man. Make, make sure it's good. I don't want to grab a lot." FRANCISCO said, I got fifteen

for you, another fifteen." (TT6 #3,654). I believe MARCIANO was telling FRANCISCO that CHRISTIAN could get them cocaine, but that MARCIANO was only going to get one kilogram in order to first make sure it was high quality. I further believe that FRANCISCO said he had $15,000 in cocaine proceeds to give to MARCIANO.

    e.    MARCIANO's next call was to JAIMES at 5:42 p.m. and he asked, "Did you want anything?" JAIMES replied, "Hell yeah." MARCIANO told him, "Yeah, it's Twin and them." JAIMES appeared to say he wanted "a little nine or something," by which I believe he meant a quarter kilogram. MARCIANO asked if one of JAIMES's customers wanted anything. So MARCIANO told JAIMES, "Just call and make sure he still wants some, though, before you grab it. Then you can grab him [the customer] some." (TT6 #3,656).

    f.    At 5:59 p.m., MARCIANO called CHRISTIAN and said, "I'mma let you know in a little bit what, um, to place the order. I might need more than, uh, more than three." MARCIANO went on, "Yeah, cause a bunch of people want some C.O.D. [cash on delivery]. I'mma just fuck with that C.O.D. right now. That fronting shit fucked me up on that bullshit." CHRISTIAN replied, "A'ight. Ain't, ain't no rush. He just called me to, he just told me he ain't going to be good to do nothing until in the morning. So just take your time and hit me up before the day over." (TT6 #3,660).

    g.    JAIMES called MARCIANO at 6:07 p.m. and told him, "He said, he'll two or three." (TT6 #3,661). I believe JAIMES was referring to his customer, who MARCIANO had told him to call.

    h.    MARCIANO called CHRISTIAN a few minutes later and asked, "Old boy won't throw you nothing?" by which I believe he was asking if CHRISTIAN's source of supply would front any of the cocaine. MARCIANO went on to explain, "Yeah, cause I was saying, I'll

16

bring the bread right back. . . . I'll get it at the end. One of them Indian cats [which is how MARCIANO and JAIMES refer to JAIMES's customer] want two of 'em." MARCIANO continued, "[J]ust tell him I'd like one, though, and bring the bread right back. . . . Yeah, cause I got, I, we got, I think I got, we got change for like three. Some shit like that." CHRISTIAN said, "Okay, okay. Let me holler at him and see." MARCIANO followed up, "Okay. And just let me know. If not, I'mma try to go and cash out before though." (TT6 #3,663). I believe MARCIANO was saying that he could pay for three kilograms up front, but wanted to know if CHRISTIAN's source would front the two kilograms intended for JAIMES's customer.

      i.     At 11:14 a.m. on June 29, 2013, MARCIANO called CHRISTIAN and asked, "You ain't holler at old boy about, um, seeing if he could throw you one, too?" CHRISTIAN replied, "[H]e act like he can't do it." MARCIANO tried to explain that they would not steal from the source and would be able to pay him quickly: "Cause ain't want nobody be ripping or running. Cause I got dude, dude want two, another cat want one, and all of them be gone soon as I get down the road." CHRISTIAN did not say it was possible, so MARCIANO said later, "Okay, then, yeah. Cause, um, I was going to say, um, yeah I might, I'mma, I might have be able to do three for right now." (TT6 #3,746). I believe that CHRISTIAN's source was not going to front MARCIANO any cocaine, so MARCIANO had to limit his order to three kilograms, which is what he, VENANCIO, FRANCISCO, and JAIMES had between them to pay for the cocaine up front.

      j.     It appeared from calls and text messages between MARCIANO and CHRISTIAN that they met at around 3:45 p.m. to travel together to the deal with CHRISTIAN's source. (TT6 #s 3,771 and 3,772).

k.      At 4:45 p.m., MARCIANO called VENANCIO and said, "Shit, I'm about ready, about to pull out now." I believe he was saying that he had the cocaine and was leaving from where he met CHRISTIAN's source. (TT6 #3,780).

l.      MARCIANO called CHRISTIAN at 5:41 p.m. and told him, "Yeah, it look good, though. She look, this 'bout the best I seen it look, though." He continued, "It had the number. It got the numbers on it again." CHRISTIAN replied, "Yeah, I could see the numbers. It got, like, '88' on it, right?" MARCIANO said, "Yeah, I think it's '5 8,' some shit like that." (TT6 #3,794). I know that kilograms of cocaine often come from Mexico with images or numbers stamped, or pressed, into the cocaine. This is sought after by drug traffickers because they feel that cocaine kilograms with stamps are less likely to have been "stepped on," or mixed with a cutting agent, and therefore will be of a higher quality.

26.     VENANCIO was identified in several ways, including the following. First, he was frequently referred to in communications as MARCIANO's brother, which he is, and by his nickname "Vinny," which is a shortened form of his first name, Venancio. Second, the phone he used to speak with MARCIANO is the same one he used with a confidential source in conjunction with a controlled purchase on June 6, 2013. Third, on October 7, 2013, pursuant to a court order, the phone he used to speak with MARCIANO was tracked to a residence in the 1100 block of Quinlan Drive, Greensboro, North Carolina. Surveillance units then saw VENANCIO leaving the residence and driving away in a black Cadillac.

27.     Agents identified JAIMES in several ways. First, JAIMES was frequently referred to in communications as "Lazaro," which is his first name, and "Lazo." Second, one of the telephones that JAIMES used to talk to MARCIANO was tracked pursuant to a court order. On October 7, 2013, JAIMES's telephone was located in a restaurant in Candor, North Carolina.

18

Surveillance units observed an Hispanic male exit the restaurant and leave alone in a gray Nissan truck. On October 8, 2013, the telephone was located at a residence in the 1000 block of Burkhead Lane, Biscoe, North Carolina. The same gray Nissan truck from the restaurant was present at the residence. On October 9, 2013, the telephone was again located at the Burkhead Lane residence, at which time surveillance units observed JAIMES, who they identified based on comparison with a North Carolina driver's license photo of JAIMES, drive away from the residence in the gray Nissan truck.

28.     FRANCISCO was identified in several ways. He is often referred to as "Frankie" or "Pancho," which is a common Spanish nickname for Francisco. In addition, according to FRANCISCO's North Carolina driver's license, his birthday is July 9, 1988. On July 9, 2013, MARCIANO sent a text message to FRANCISCO that read, "Happy birthday bro i love you." (TT6 #5,043). That same day, MARCIANO told an associate that it was Frankie's birthday and that they were going to go out to get something to eat. (TT6 #5,128).

29.     CHRISTIAN was identified in the following manner.

a.     On August 6, 2013, at 5:45 p.m., MARCIANO called the man then known to investigators as "Twin" and "Trey." During the call "Twin" said, "I just hit your wife up on Facebook, but tell her never mind." (TT10 #187). Agents obtained a search warrant for the Facebook account used by MARCIANO's wife, and located a posting on August 6, 2013, at 5:42 p.m. that said, "Hey cuzn have yall lef 4 beach yet? Tell j I said give me a call." MARCIANO's full name is Marciano Reza, Jr., and he is referred to often in his wife's Facebook account as "Jr.," for which "J" is a shortened form. The August 6th posting was made by the user of Facebook account BrennanChristian, which is CHRISTIAN's name. A photograph of the user of Facebook

account BrennanChristian matches a prior booking photo of CHRISTIAN, who is currently on probation for charges related to dealing cocaine.

   b. Agents conducted a records search and determined that CHRISTIAN's birthday is in September, and he lives in High Point, North Carolina. "Twin" said he had a birthday in September in an intercepted call with MARCIANO (TT6 #5,375), and cell site location data from his phone showed it had a definitive link to the area of High Point, North Carolina.

   c. Agents also determined that CHRISTIAN has a twin brother named Brent. Brent has been incarcerated since in and around June 2012 in connection with a federal case in which he was ultimately convicted of possession with intent to distribute 500 grams of cocaine and possession of a firearm in connection with a drug trafficking crime. He is not scheduled to be released from prison until 2025.

### FOURTEEN KILOGRAM DEAL ON APRIL 13, 2013

   30. The second day of interception of Target Telephone #5, the first of MARCIANO's phones to be wiretapped, was April 13, 2013. There were several calls that day concerning MARCIANO meeting at a Walmart in Greensboro, North Carolina, to pick up what I believe to be fourteen kilograms of cocaine. Further investigation uncovered that UCC-1 was the source of the cocaine and that it was delivered to MARCIANO via a tractor trailer owned by GUARDIA and driven by WELCOME. Before describing the deal, what follows is a discussion of how GUARDIA and WELCOME were identified.

### i. Identification of GUARDIA and WELCOME

   31. GUARDIA is the owner of a long-haul trucking company based in New Jersey. Target Telephone #8 is the listed business phone for GUARDIA's company and is subscribed to in GUARDIA's name. In intercepted communications over Target Telephone #8, GUARDIA self-

identified himself numerous times, to include his full name, date of birth, and the last four digits of his Social Security number. Additionally, location-based information on the phone showed it consistently in the immediate vicinity of the address for GUARDIA's company.

32.     Also relevant to the April 13th deal is a telephone number ending in the last four digits 1089, which I believe, based on the following evidence collected after the deal, was used by GUARDIA to communicate with MARCIANO that day.

a.     Investigators obtained passenger records for United Airlines Flight 4209 from Nashville to Newark for April 26, 2013, showing GUARDIA as a passenger on that flight. The flight departed Nashville at 11:31 p.m., and arrived in Newark at 1:24 a.m.

b.     On April 26, 2013, location based information for the telephone number ending in the last four digits 1089 showed that the telephone was located in Nashville, Tennessee, in the immediate vicinity of Nashville International Airport at 8:00 p.m. At 1:24 a.m. on April 27, 2013, the telephone was located at Newark International Airport. The telephone arrived in the vicinity of 21 Chestnut Street, Clifton, New Jersey, at 2:15 a.m. on April 27, 2013, and remained there until 1:00 p.m. that afternoon.

c.     On April 30, 2013, at 2:35 a.m. CST (Central Standard Time), according to records from the Federal Motor Carrier Safety Administration, GUARDIA, who was driving a truck, was stopped by the Arkansas State Police and inspected at a highway inspection station at mile marker 282 on Interstate Highway 40 westbound in Arkansas. Records show the driver was GUARDIA and the carrier name for the truck he was driving was C K Hauling, Inc. Location-based information for the telephone number ending in the last four digits 1089 showed that at 2:50 a.m. CST, the telephone was located in the vicinity of Interstate Highway 40, mile marker 282, in Arkansas.

d.      A comparison between the voice of GUARDIA on intercepted calls over Target Telephone #8 and the man who called MARCIANO on April 13, 2013, using the telephone number ending in the last four digits 1089 show that it is the same person.

33.      WELCOME is a truck driver who works for GUARDIA. On May 18, 2013, he was stopped by a Texas Department of Public Safety (DPS) Trooper near Amarillo, Texas, for several equipment violations and for a Federal Motor Carrier Safety inspection. During the inspection, the Trooper found two suspicious boxes, which were subsequently searched. One box was found to contain twenty-five packages of suspected methamphetamine, weighing approximately 14.7 kilograms, and the other contained nine packages of suspected cocaine, weighing approximately 9.8 kilograms. WELCOME was arrested and held in the Potter County Correctional Center until May 22, 2013. At the time of his arrest, WELCOME was in possession of Target Telephone #7, which is subscribed to in his name. WELCOME said he worked for GUARDIA and the truck WELCOME was driving was registered in GUARDIA's name. Below is a photograph of the truck:



### ii.   Description of deal on April 13, 2013

34.    At 10:53 a.m.[2] on April 13, 2013, GUARDIA used the telephone number ending in the last four digits 1089 to call MARCIANO. (TT5 #19). The following is a portion of their conversation:

GUARDIA:    In two hours exactly, Greensboro. I will call you for the exit, okay? I told you that. . . .

MARCIANO: Okay, in two hours?

GUARDIA:    Yes, and what time you will get out? Eh, do me a favor, do me a favor . . .

MARCIANO: Uh huh.

GUARDIA:    The, the, the, how do I tell you? The papers that you have, wrap it up good. I want you to wrap it up real good.

MARCIANO: Uh huh. How much do you have then?

GUARDIA:    How many tamales are they? Fourteen, right?

MARCIANO: Yes, fourteen, ah, yes.

GUARDIA:    Ok, wrap it up good please. Put tape, all really good wrap up, if you can please.

35.    At 10:55 a.m., MARCIANO called VENANCIO and asked, "A'ight, you got any change laying around?" He went on, "Can you, um, get four Benz for me and, um, um, like clean, uh, like, um, tape it up and everything for me?" and then explained, "Vacuum it real good and, um, do it real quick." VENANCIO said, "Okay, then." (TT5 #23). I believe MARCIANO was

---

[2] There is a difference of approximately three minutes between the times listed on the toll records for Target Telephone #5 provided by Verizon Wireless and the time stamp recorded by the program used by the FBI to intercept the telephone calls. In order to avoid confusion, the call times for all calls related to the deal are derived from the toll records.

telling VENANCIO he needed $40,000 to pay for a portion of the fourteen kilograms (which MARCIANO and GUARDIA referred to as "tamales") he was going to pick up in Greensboro.

36.     MARCIANO called VENANCIO back at 11:17 a.m., who asked, "Who you gotta meet at that road?" MARCIANO replied, "Them, them boys with that, um, that load." He continued later, "He got to wait on his last load so he can go back home. That's why he waited." I believe MARCIANO was explaining that the person with the cocaine had delivered other items, whether drugs or other goods, and that his last load was the cocaine for MARCIANO. MARCIANO asked later in the call about the money, "Did you tape it up . . .?" VENANCIO responded, "I Saran wrapped it real good." (TT5 #29).

37.     At 11:50 a.m., MARCIANO called UCC-1, who said, "That one called you and said he would meet you in forty-five minutes," which I believe is a reference to the call MARCIANO received from GUARDIA in which the latter said the meeting would take place at approximately 1:00 p.m. UCC-1 explained, "There's a guy who wants to drive the car. He wants to drive." I know this to be a reference to an associate of UCC-1 that was going to drive MARCIANO to the deal. MARCIANO said, "That's fine," and then said, "I have a house near [Interstate] 40. The guy driving and I can go there so that we don't have to drive too far with everything. . . . I was getting ready because I have to pick up some money nearby where the guy is going. And I'll go near there with the guy who is driving." (TT5 #54).

38.     MARCIANO then called UCC-1's associate at 11:53 a.m. and they agreed to meet at a mall in and around Greensboro. (TT5 #55).

39.     At 1:08 p.m., GUARDIA called MARCIANO and asked, "Are you around there? You're in Greensboro?" MARCIANO said, "Yes, I'm here." GUARDIA replied, "Okay. Greensboro, 40 'boches' [PH], exit 214. Walmart. . . . It's at the back of the Walmart."

MARCIANO asked, "You're behind Walmart?" and GUARDIA responded, "Uh huh. On the side, it's a yellow one, the trailer says L-C-T-D [PH]. It's a big one, blue." MARCIANO clarified, "Okay, uh, it's a big trailer?" GUARDIA told him, "It's a trailer with blue letters 'L-C-T.'" Later GUARDIA said, "Okay, I'll, my, um, my driver call you. He speaks English very well." (TT5 #62). I believe GUARDIA was providing directions to a Walmart located off Exit 214 on Interstate 40 where a driver with a truck and tractor trailer would be waiting with the cocaine for MARCIANO.

40.    Agents confirmed that there is a Walmart in Greensboro, North Carolina, that is in close proximity to Exit 214 on Interstate 40. The physical address is 4424 West Wendover Avenue, Greensboro, North Carolina. Agents obtained the Walmart's surveillance video footage from April 13, 2013, at around the time of the deal. At 1:02 p.m., the footage showed a truck that matched GUARDIA's description arrive at the rear of the Walmart and finish parking at 1:04 p.m. A still shot of the truck from the surveillance footage is below, and it appears to be GUARDIA's truck that WELCOME was driving when he was arrested in Amarillo on May 18, 2013.



41.    Toll records show that at 1:05 p.m., WELCOME used Target Telephone #7 to call GUARDIA on Target Telephone #8. The call lasted approximately two minutes and fifty-five seconds. I believe WELCOME was telling GUARDIA that he had arrived, which is reflected by

the above-described call GUARDIA made to MARCIANO at 1:08 p.m. to say his driver was in a truck behind the Walmart.

    42.    At approximately 1:20 p.m., tolls records show that WELCOME used Target Telephone #7 to again call GUARDIA on Target Telephone #8. The call lasted approximately two minutes and twenty seconds. While they were on the phone, MARCIANO called GUARDIA on the telephone number ending in the last four digits 1089. (TT5 #66). The following is a portion of their conversation, the italicized portions of which were in Spanish:

MARCIANO: *What's up, bro?*

GUARDIA: *Did you see it already?*

MARCIANO: *Yeah, you said it's in back?*

[OV]

GUARDIA: *It's a yellow one.*

MARCIANO: *I don't know. Is it in the back or front of Walmart?*

GUARDIA: *In back.*

MARCIANO: *In back?*

GUARDIA: *Yes.* Yeah.

MARCIANO: *Okay, okay. Right now we're here. We'll find it.*

GUARDIA: Okay. 910 -- hold on -- *He's going to call you.* 910 . . .

MARCIANO: Uh huh.

[Can hear voice of person on other phone in background]

GUARDIA: Eh 975-5311.

MARCIANO: *That's my number, right?* [laughs]. Bro?! *Is the number . . .*

[OV]

GUARDIA:   5311.

MARCIANO: *That is my number.*

[Can hear voice of person on other phone in background]

GUARDIA:   910-975-5311. Call [OV] very close to you.

MARCIANO: [OV] *that's my number.*

GUARDIA:   Eh, [UI] he close to you, he call you, okay? [UI] working each other's.

43.    At 1:23 p.m., WELCOME used Target Telephone #7 to call MARCIANO on Target Telephone #5, which was telephone number (910) 975-5311. The two had a brief exchange that was mostly inaudible, but during which MARCIANO said, "I'm here." (TT5 #67).

44.    At approximately 1:23 p.m., the surveillance video shows a white sedan pull into the Walmart parking lot and park near the front of the truck pictured above. The front passenger then exits the white sedan and approaches the driver of the truck, who is outside of the truck but then immediately returns to the cab of the truck.

45.    At approximately 1:24 p.m., surveillance shows the white sedan drive to the area near the rear of the container of the truck. The truck driver opens the container, removes a large item from the container, and places it in the trunk of the white sedan, which was opened by the passenger of the sedan.

46.    At approximately 1:25 p.m., surveillance shows the two occupants of the white sedan return to the vehicle and drive away. The truck driver closes the container and returns to the cab.

47.    Toll records show that WELCOME used Target Telephone #7 to call GUARDIA on Target Telephone #8 at 1:26 p.m. At that same time, surveillance shows the white sedan drive

past the truck again, which behavior, I believe, is consistent with surveillance detection routines commonly utilized by drug traffickers.

48.     At 1:34 p.m., GUARDIA used the telephone number ending in the last four digits 1089 to call MARCIANO. MARCIANO said, "[T]hey said it's fourteen guys. . . . [W]e're going to check it out. Didn't get a chance to check it out because the [UI] cameras." (TT5 #71). I believe MARCIANO was confirming that he received fourteen kilograms of cocaine but that he did not get to physically inspect the cocaine in the Walmart parking lot because of the presence of surveillance cameras that he observed there, but intended to check the contents later at a better location.

49.     The surveillance footage shows the truck pulling away at 1:37 p.m. and exiting the Walmart parking lot a minute later.

50.     Historical cell site information collected on Target Telephone #7 shows that the phone moved through the following locations, among others, on the following days:

    a.      April 6, 2013: the area of Los Angeles, California (WELCOME is from California);

    b.      April 7, 2013: Nevada;

    c.      April 8, 2013: Texas;

    d.      April 9, 2013: Oklahoma;

    e.      April 10, 2013: Tennessee;

    f.      April 11 and 12, 2013: New York;

    g.      Morning of April 13, 2013: Richmond, Virginia, within the Eastern District of Virginia;

h.      April 13, 2013, between 1:05 p.m. and 1:26 p.m.: the phone hit off a cell tower directly across the street from the Walmart in Greensboro, North Carolina, described above; and

i.      April 13, 2013, through April 17, 2013: in order, went from North Carolina through Tennessee, Arkansas, Oklahoma, Texas, Arizona, and, finally, California.

51.     Based on my training and experience, and knowledge of the investigation, this pattern of movement is consistent with a cross-country truck driver, and corroborates that WELCOME, the user of Target Telephone #7, was the person who drove the truck into the Walmart on April 13, 2013, and delivered what I believe to be fourteen kilograms of cocaine to MARCIANO. I further believe that WELCOME drove with the cocaine through the Eastern District of Virginia on his way to the deal with MARCIANO in Greensboro, North Carolina.

52.     On April 13, 2013, at 1:53 p.m., MARCIANO called VENANCIO and told him he was on his way home and then said, "It's the one four," by which I believe he was saying he had fourteen kilograms. VENANCIO asked, "What about, say, what's the time frame, though?" MARCIANO told him, "Uh, now, fifteen days." (TT5 #76). I believe they were discussing how long they had to sell all the cocaine to pay off the remaining balance they owed the source of supply.

53.     At 2:04 p.m., CHRISTIAN called MARCIANO, who told him, "I got something. I got that food in already." CHRISTIAN asked, "It look like originals?" and MARCIANO responded, "Yeah, original CDs. They don't look like no bootleg CDs." He later asked, "You want like two or three of 'em?" CHRISTIAN replied, "Yeah, yeah. That's all I'm trying to do." (TT5 #83). I believe MARCIANO was telling CHRISTIAN that the cocaine he picked up appeared to be high quality and that he would give him two to three kilograms.

54.     At 2:34 p.m., MARCIANO received a call from FRANCISCO. MARCIANO told him, "I got some girl," by which I believe he meant cocaine. Then MARCIANO asked, "Did you any, did you need any?" FRANCISCO said, "Yeah, yeah, yeah, yeah." MARCIANO told him, "Okay, then. Yeah I got some for you." (TT5 #100).

55.     MARCIANO called UCC-1 at 5:13 p.m. and said, "Yeah, I'll finish them in fifteen days," confirming that he only had that length of time to sell the fourteen kilograms and pay off what he (MARCIANO) owed. (TT5 #161).

56.     At 6:07 p.m., MARCIANO called FRANCISCO and said, "I'm only bringing three, though." FRANCISCO said, "Okay then." (TT5 #196). I believe they were talking about three kilograms of cocaine that FRANCISCO was going to receive.

57.     At 8:36 p.m., HILL called MARCIANO and told him, "I'm thinking like maybe three or four." MARCIANO asked, "Three or four of them?" HILL confirmed and MARCIANO said, "Just call me. I got it man. I got whatever, so just call me." I believe they were speaking about three or four kilograms of cocaine. Later in the call, HILL said, "Okay, I'll call you, dog. It's, it's not a definite. I was just calling to make sure you okay." (TT5 #267).

58.     On April 15, 2013, at 4:10 p.m., MARCIANO called JAIMES, who asked, "What's left?" MARCIANO went on to tell him that at "the spot" there were "two down there; like two-and-a-half [UI] split." JAIMES replied, "Oh, okay. I'm gonna have to get me one. . . . I'm gonna leave it the way it is. I'm just gonna move this one time." MARCIANO asked, "What are you gonna charge them, forty?" JAIMES said, "Ah, forty-one." MARCIANO said, "Yeah, okay. That's cool, then. You charge forty-one. That's cool." JAIMES asked, "Thirty-five, then, right?" MARCIANO told him, "Shit, hell no [laughter]. No I'll just charge you, ah, I was charging everybody thirty-six-and-a-half." JAIMES replied, "Oh, okay. Yeah, that's cool." (TT5 #507). I

believe that MARCIANO had two-and-a-half kilograms of cocaine left over from the April 13th deal that he was offering up to JAIMES, who said he only needed one. I further believe that MARCIANO said the kilograms were split into half-kilogram quantities, and that JAIMES said he was going to leave two halves the way they were and charge his customer(s) $41,000 total. Finally, I believe that MARCIANO said he would charge JAIMES $36,500 for the kilogram, meaning JAIMES would make a $4,500 profit.

### SEARCH OF 679 WRIGHT COUNTRY ROAD, RAMSEUR, NORTH CAROLINA

59.     On October 17, 2013, law enforcement arrived at 679 Wright Country Road, Ramseur, North Carolina (hereinafter referred to as Target Location #3), in an attempt to arrest MARCIANO and execute a search warrant at Target Location #3. As outlined in the affidavit in support of the search warrant for Target Location #3, open source information showed that MARCIANO and his wife lived at Target Location #3 and had done so since at least in and around February, 2013. Additionally, on September 25, 2013, the Honorable T. Rawles Jones, Jr., United States Magistrate Judge for the Eastern District of Virginia, signed a search warrant and order authorizing the disclosure of precision location information, or "GPS Pings," for telephone number (336) 257-2695, which was known to be used by MARCIANO. Location data for this telephone showed that throughout every night between September 26, 2013, and October 9, 2013, (as of the writing of the affidavit in support of the search warrant for Target Location #3) the telephone was located in the immediate vicinity of Target Location #3.

60.     On the morning of October 17, 2013, law enforcement located and arrested MARCIANO at Target Location #3. MARCIANO's wife, Kendra FRENCH REZA, and their two children, were also present at Target Location #3 when law enforcement executed the search warrant on that date.

31

61.     During the execution of the search warrant at Target Location #3, which is a single-family home, law enforcement officers seized **Devices 1 and 2** and $44,915 in U.S. currency in the master bedroom. In addition, law enforcement officers seized **Devices 3, 4, 5 and 6** in the kitchen and approximately two kilograms of cocaine in a utility closet off of the kitchen. **Device 6** bears MEID HEX # A0000039EBE38B, which is the Device ID provided by Verizon Wireless for Target Telephone #6.[3]

62.     MARCIANO ultimately pled guilty to Conspiracy to Distribute Five Kilograms or more of Cocaine on February 3, 2014 (Case No. 1:14-CR-9). As a result of the disposition of MARCIANO's case prior to trial, the FBI did not forensically examine the Devices in 2013-2014. However, co-conspirator CHRISTIAN's case (Case No. 1:16-CR-207) is currently pending in this district, and a retrial is scheduled to begin on August 1, 2017. I believe the Devices may contain evidence of the drug conspiracy involving MARCIANO, CHRISTIAN, and others.

63.     The Devices are currently located at 9325 Discovery Boulevard, Manassas, Virginia, within the Eastern District of Virginia. In my training and experience, I know that the Devices are being maintained in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of law enforcement.

64.     Based on my training and experience, I know that individuals who conspire to possess and distribute narcotics often use cellular telephones to communicate with one another orally and via text messages both before and after the crime. They also use their cellular

---

[3] In addition to the six Devices, other cellular phones and electronic devices were also seized at Target Location # 3. On October 19, 2014, I spoke with MARCIANO's wife, Kendra FRENCH REZA and arranged to return two of the cell phones and other electronic devices because she established that they belonged to her and not MARCIANO.

telephones to coordinate and arrange their crimes and sometimes to photograph and/or video

themselves and their fellow conspirators, the fruits of their crimes, and the instruments used in

committing their crimes.   Individuals who conspire to possess and distribute narcotics also often

store the contact information of their criminal associates in their cellular phones.  I also know

that such individuals often use their cellular phones as a GPS navigation device to map the

directions to locations where they intend to take possession of narcotics or deliver narcotics.

      65.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

      a.    <u>Wireless telephone</u>:  A wireless telephone (or mobile telephone, or cellular

telephone) is a handheld wireless device used for voice and data communication

through radio signals.  These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.  A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and

from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated

34

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.     Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller

than a notebook that is primarily operated by touching the screen.  Tablets

function as wireless communication devices and can be used to access the Internet

through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.  IMEI number:  The International Mobile Equipment Identity ("IMEI") is a unique number given to every single cellular device. International Mobile Subscriber Identity ("IMSI") is a unique fifteen-digit code used to identify an individual user on a Global System for Mobile Communications network.

j.     MEID number: A Mobile Equipment Identifier (MEID) is a unique number given

to each cellular device utilizing CDMA (Code Division Multiple Access)

technology for wireless service.

66.     Based on my training, experience, and research, I know that the smartphones have

capabilities that allow them to serve as a wireless telephone, digital camera, portable media

player, GPS navigation device, or PDA.  In my training and experience, examining data stored

on electronic devices can uncover, among other things, evidence that reveals or suggests who

possessed or used the device.

67.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensic tools.

68.     There is probable cause to believe that things that were once stored on the Device

may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little

or no cost.  Even when files have been deleted, they can be recovered months or

years later using forensic tools.  This is so because when a person "deletes" a file

on a computer, the data contained in the file does not actually disappear; rather,

that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

69.    <u>Forensic evidence</u>. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a

38

file (such as a paragraph that has been deleted from a word processing file).   For

computers, virtual memory paging systems can leave traces of information on the

storage medium that show what tasks and processes were recently active.   Web

browsers, e-mail programs, and chat programs store configuration information on

the storage medium that can reveal information such as online nicknames and

passwords.   Operating systems can record additional information, such as the

attachment of peripherals, the attachment of USB flash storage devices or other

external storage media, and the times the computer was in use.   Computer file

systems can record information about the dates files were created and the

sequence in which they were created.

b.     Forensic evidence on a device can also indicate who has used or controlled the

device. This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may,

after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who

used them, and when.

d.     The process of identifying the exact electronically stored information on a storage

medium that are necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators.   Whether data stored on a computer is

evidence may depend on other information stored on the computer and the

application of knowledge about how a computer behaves.   Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

70.     <u>Nature of examination</u>.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

71.     Based upon the above information, I submit that probable cause exists to authorize the examination of the Devices described in Attachment A in order to seize the items described in Attachment B.

Kenneth M. Smith
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me this ___23rd___ day June, 2017.          _____/s/_____
                                                                    Theresa Carroll Buchanan
                                                                    United States Magistrate Judge

The Honorable Theresa C. Buchanan
United States Magistrate Judge

40

## ATTACHMENT A

The property to be searched is the following device ("Device 5"), currently in the custody of the Federal Bureau of Investigation, and located at 9325 Discovery Boulevard, Manassas, Virginia, within the Eastern District of Virginia:

- a black and white HTC cellular phone, bearing serial number  HT14SHL14071

## ATTACHMENT B

1.      All information and records on the Device described in Attachment A that may be evidence of violations of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine), including, but not limited to:

> communications or information relating to the planned receipt, transportation, or distribution of cocaine;

> photographs or videos of criminal associates;

> address/phone books or contact information that reflect names of potential criminal associates;

> call logs;

> records, photographs, videos, or communications relating to the purchase of duffle bags or other items for use in connection with the receipt and transportation of cocaine;

> records of storage facilities owned or rented;

> cellular and landline telephone statements and records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of Internet Protocol addresses, including:

      a.      records of Internet Protocol addresses used;

      b.      records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.      All GPS information on the subject phone.

      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. Such records and information include the content of communications, text messages, voice mail messages, photographs, images, and video.